**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| SKYBELL TECHNOLOGIES, INC.,<br><br>      Plaintiff,<br><br>  v.<br><br>ALARM.COM, INC.,<br><br>      Defendant. | Civil Action No. 1:25-cv-01105-RDA-WBP<br><br>**JURY TRIAL DEMANDED** |

**AMENDED COMPLAINT FOR TRADE SECRET MISAPPROPRIATION**
**AND COPYRIGHT INFRINGEMENT**

Plaintiff SkyBell Technologies, Inc. ("SkyBell"), by and through its counsel, brings this Amended Complaint for misappropriation of trade secrets and copyright infringement against Defendant Alarm.com, Inc. ("ADC"), as follows:

**INTRODUCTION**

1.      SkyBell exemplifies the kind of foundational innovation that reshapes industries. By collapsing the traditional boundaries between hardware, software, and networked intelligence, SkyBell transformed the doorbell into a fully integrated node of the connected home—pairing real-time video doorbells and cloud architecture into a unified, frictionless user experience.  SkyBell's relentless prioritization of privacy, user control, and system-level interoperability quickly captured the attention of home security companies like ADC.

2.      ADC, while established in the home sector, has never been a doorbell company either in origin or orientation.  As a result, ADC lacked the native engineering capability to design, build, or iterate on consumer-grade, connected video doorbells when customers began demanding

them in the mid-2010s.  So ADC turned to SkyBell, whose early-mover advantage, trade secrets, and patent portfolio made it a crucial technology partner.

3.    In 2015, ADC entered into a "Development and Integration" agreement with SkyBell, under which ADC sourced from SkyBell video doorbell technology for integration into its platform offerings.  As part of this commercial arrangement, ADC obtained a limited license to use certain of SkyBell's trade secrets—use that was both narrow in scope and expressly contingent on the supply relationship.  The agreement did not transfer ownership or confer any broader usage rights to ADC.  By design, SkyBell retained full control over its intellectual property portfolio, including its highly valuable trade secrets; ADC's use of SkyBell's innovations was contractually restricted and non-renewable absent mutual agreement.  Pursuant to the agreement, ADC began selling video doorbells that interfaced with and incorporated SkyBell's technology and trade secrets, making hundreds of millions of dollars.

4.    But ADC was severely underpaying SkyBell.  As a result, SkyBell terminated the supply relationship in 2022, which also terminated ADC's rights to use SkyBell's trade secrets (other than for use with devices already sold to ADC).  SkyBell reasonably expected that, pursuant to the supply agreement, ADC would stop using SkyBell's trade secrets for any video doorbells not supplied by SkyBell.  But ADC had other plans.  ADC began making copycat video doorbell products and used SkyBell's trade secret backend technology to support those products— misappropriating SkyBell's trade secrets with no license, no agreement, and no justification.

5.    ADC's continued exploitation of SkyBell's proprietary technology—after its contractual rights to do so had unequivocally expired—is not merely a breach of commercial norms.  It is a deliberate and indefensible theft of trade secrets to which it no longer has any legal entitlement.

6.     ADC did more than misappropriate SkyBell's trade secrets. ADC also willfully infringed SkyBell's copyrights in original source code that SkyBell developed to broadcast event notifications between its video doorbells and connected devices. ADC gained access to that source code through its limited license under the parties' agreement, then deliberately copied and/or created derivative works based on it to launch its own competing video doorbell products. ADC's own internal records show ADC gave its engineers explicit instructions to implement features ███████████████████████████

## THE PARTIES

7.     Plaintiff SkyBell Technologies, Inc. is a corporation organized and existing under the laws of the State of Nevada with its principal place of business at 1 Jenner #100, Irvine, California 92618.

8.     Defendant Alarm.com, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 8281 Greensboro Drive, Suite 100, Tysons, Virginia 22102.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338 because this action arises out of violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*, and the Copyright Act of 1976, 17 U.S.C. § 101, *et seq*.

10.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over SkyBell's claim under the Virginia Uniform Trade Secrets Act, Va. Code §§ 59.1-336 – 59.1-343, because the claims are so related to SkyBell's Defend Trade Secrets Act claim that together they form part of the same case or controversy.

3

11.     This Court additionally has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is diversity of citizenship between SkyBell and ADC and the amount in controversy exceeds $75,000.

12.     This Court has personal jurisdiction over ADC.  This Court has general personal jurisdiction over ADC because ADC's principal place of business is within this judicial district. This Court also has personal jurisdiction over ADC based on ADC's purposeful availment of and connection to Virginia, including those that relate directly to and form the basis of the trade secret misappropriation claims described in this Amended Complaint.  For example, ADC has misappropriated SkyBell's trade secrets and has sold and offered to sell the products at issue in this lawsuit in this District.

13.     ADC, directly or through intermediaries, makes, distributes, offers for sale, and/or advertises its products and services that unlawfully incorporate SkyBell's trade secrets in the United States, the Commonwealth of Virginia, and the Eastern District of Virginia.

14.     Based on ADC's conduct, it was wholly foreseeable that it would be subject to a suit in the Eastern District of Virginia.

15.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1)-(2) because ADC maintains its principal place of business in this District and because a substantial part of the events or omissions giving rise to SkyBell's trade secret misappropriation and copyright infringement claims occurred in this District.

16.     Venue is proper in this Division because ADC maintains its principal place of business in Fairfax County, in this Division, and because a substantial part of the events or omissions giving rise to SkyBell's trade secret misappropriation and copyright infringement claims occurred in this Division.

4

**ADC'S WILLFUL MISAPPROPRIATION OF SKYBELL'S TRADE SECRETS**

**A.    SkyBell's Trade Secrets Are Critical To Its Business And Success**

17.    SkyBell—originally called iDoorCam—was founded in 2013 by Joseph Scalisi, Desiree Mejia, and Andrew Thomas.  At the time, Mr. Scalisi worked in a small business without a receptionist.  Whenever a visitor knocked, whoever sat closest to the door had to jump up to answer.  Mr. Scalisi devised a novel solution to the problem: a video doorbell that displayed every visitor on the screen of a smartphone.  Realizing he was onto something, Mr. Scalisi formed a team to design and engineer his vision.

18.    By September 2013, SkyBell successfully prototyped its video doorbell.  By that time, SkyBell had launched an extremely successful crowdsourcing campaign, raising approximately $600,000 for its device on the website Indiegogo (plus another $300,000 in sales from the SkyBell website).

19.    In January 2014, buoyed by the success of the Indiegogo campaign, SkyBell introduced its first video doorbell product to the market.  Since that time, SkyBell has released several versions of its signature round video doorbell, as well as thinner models, including the SkyBell Slim Line and SkyBell Trim Line.

20.    SkyBell has achieved significant success by entering into major industry partnerships as well as marketing directly to consumers.  To support both its direct-to-customer products and its products delivered to key partners, SkyBell has invested substantially into innovation, research, and development.

21.    One area of significant investment for SkyBell has been in the development of its proprietary "backend" platform to support its video doorbells.  The SkyBell backend enables SkyBell's video doorbell devices to securely and stably communicate with other devices in a home

security and automation system. The SkyBell backend also enables users to interact with SkyBell's video doorbells using other electronic devices, such as a smartphone.

22. As a result of its substantial investments and years of innovation, significant aspects of SkyBell's backend, and its functionality for interacting and communicating with SkyBell's video doorbells, are highly confidential and maintained in strict confidence as trade secrets to protect the substantial investment made to develop them. This confidential information derives considerable value from not being publicly known outside of SkyBell, because of the competitive advantages, among other things, that the trade secrets confer on SkyBell from both a technological and business perspective.

23. As part of the 2015 supply agreement, ADC used SkyBell's trade secrets and, as discussed in further detail below, continued to use SkyBell's trade secrets after SkyBell terminated the supply agreement in 2022. These trade secrets include:

- Source code for the SkyBell backend;

- Technical know-how for developing and implementing the SkyBell backend, including in connection with video doorbell devices;

- Proprietary system architecture for the SkyBell backend, including know-how and associated source code;

- SkyBell's unique Constrained Application Protocol ("CoAP") implementation, including its CoAP messaging schema—including the field names, lengths, encryption parameters, event-type taxonomy, and call-identification logic—used by SkyBell doorbells and chimes to interact with cloud servers;

- Proprietary encryption techniques for wireless communications between a video doorbell and other connected devices and unique communication layers for coding and decoding packets, including know-how and associated source code;

- Proprietary video and live feed manager for enabling stable and secure video communications between video doorbells and connected devices, including know-how and associated source code; and

6

- Proprietary combination of application programming interfaces ("APIs") to enable interconnectivity between video doorbells and connected devices, including know-how and associated source code.

24. These trade secrets derive considerable value from not being publicly known outside of SkyBell, including because of the competitive advantage that the secret nature of the information confers on SkyBell from both a technological and business perspective. And, as discussed, SkyBell has spent significant time and money developing such confidential information and trade secrets.

**B.    SkyBell Diligently Protects Its Trade Secrets**

25. Given the highly valuable and confidential nature of SkyBell's trade secrets, SkyBell employs extensive, numerous measures to maintain secrecy. SkyBell has acted reasonably and diligently to protect the secrecy of its trade secrets and confidential information, including through the following:

- SkyBell requires SkyBell's employees, including executive employees, to sign a SkyBell employment agreement, pursuant to which they agree to protect and not to disclose or use SkyBell's confidential information and trade secrets, including after the employee's employment period;

- SkyBell further requires exiting employees to participate in an exit process and to confirm that they have been provided access to SkyBell's confidential information and trade secrets, have returned all such information to SkyBell upon exiting, and have not maintained access to or copies of any digital or hard copy record of SkyBell's confidential information and trade secrets;

- SkyBell's proprietary and trade secret information is stored on secure servers and databases and only certain SkyBell employees and partners have access to such servers and databases. Access to these servers and databases is on a "need to know" basis and employees must be approved to obtain such access. Partners must enter into confidentiality agreements before they are permitted access;

- SkyBell also implements additional security measures to safeguard and protect sensitive information, including access restrictions, authentication, password protection, encryption, and physical protections;

- SkyBell's systems and software are designed to prevent hacking or reverse engineering, and the company's systems are protected from external and internal cybersecurity threats;

- SkyBell maintains secure offices, workspaces, and facilities and has controlled access to its buildings; and

- SkyBell requires third-parties who may be granted access to SkyBell's proprietary information to enter into non-disclosure and other agreements that protect SkyBell's proprietary information.

**C.    ADC Misappropriated SkyBell's Highly Valuable Trade Secrets After SkyBell Terminated The Parties' Supply Relationship**

26.    In 2015, recognizing SkyBell's meteoric rise in the video doorbell market, ADC—lacking the internal capacity to provide video doorbells to its home security customers—sought out SkyBell to fill the gaps in its own platform. ADC lacked the engineering expertise and technical know-how to develop consumer-grade video doorbells or to integrate them into its home security and automation systems. Faced with intensifying market competition for video doorbells, ADC sought to repackage SkyBell's innovations as its own—seeking access to SkyBell's proprietary designs, backend systems, and associated trade secrets.

27.    The parties ultimately entered into a partnership, under which SkyBell agreed to provide ADC with limited use of its proprietary technology, confidential information, and trade secrets. The purpose of this agreement was clear: ADC would rely on SkyBell's technology and trade secrets to support and enhance its own offerings in the home security market, ***so long as the partnership was ongoing.***

28.    Central among the agreements between SkyBell and ADC was a November 2015 "Development and Integration Agreement" ("DIA"). Under the DIA, SkyBell manufactured video doorbells for ADC. ADC, in turn, was permitted to use SkyBell's trade secrets to integrate the video doorbells with ADC's home security platform. The DIA expressly required ADC to

8

maintain the confidentiality of SkyBell's trade secrets and not use them for any purpose other than the limited use provided therein.  To that end, SkyBell granted ADC a *term-limited* license to electronically access SkyBell's APIs and other SkyBell trade secrets.  Crucially, the DIA made explicit that the license conveyed no ownership, no perpetual rights, and no entitlement to SkyBell's trade secrets.  And upon termination of the agreement, ADC's use of SkyBell's trade secrets was to cease entirely—except for a short, transitional period exclusively to support legacy customers.

29.    ADC reaped immense financial rewards—measured in the hundreds of millions of dollars—from its commercial relationship with SkyBell.  But while ADC benefitted handsomely, it failed to uphold even the basic obligations of a good-faith partner.  The relationship was fundamentally lopsided: SkyBell delivered innovation and intellectual property; ADC delivered obstruction, opportunism, and eventual betrayal.  Indeed, ADC was preparing for its betrayal for years because it actively poached several key SkyBell employees, on information and belief based on their knowledge and use of SkyBell's trade secrets.  By October 2022, SkyBell had seen enough.  SkyBell terminated the DIA and its partnership with ADC.

30.    Upon termination, which was effective November 2022, ADC's obligations were unambiguous: cease use of SkyBell's trade secrets and honor its contractual and legal duty to safeguard them.  ADC did the opposite.  ADC continued exploiting SkyBell's trade secrets—to which it no longer had any right—and rolled out blatant knockoffs of SkyBell's video doorbell products.  This mimicry was not accidental.  ADC's knock-off products bear a striking resemblance to SkyBell's designs and—critically—continue to use SkyBell's trade secrets to operate within ADC's home security infrastructure, including SkyBell's proprietary video and live

feed manager for enabling stable and secure video communications between video doorbells and connected devices.



*SkyBell's Slim Line II (left); ADC's VDB750 (right)*

31.    But that is not all.  ADC's video doorbells continue to communicate with backend systems using CoAP—the same lightweight messaging protocol SkyBell uses in its proprietary software and firmware—and include payloads that are identical to those transmitted by SkyBell devices.  Some of the transmitted data fields continue to use the same name, length, and data type as defined in SkyBell's confidential and trade secret source code, confirming ADC's blatant misappropriation.  As just one example, ADC's video doorbells use event messages with the nomenclature and hierarchical notation that SkyBell created.  And those video doorbells use the same API endpoints defined in SkyBell's source code.

32.    ADC's misconduct was not just wrongful—it was calculated.  ADC deliberately stole SkyBell's trade secrets to sidestep the costs, delays, and technical hurdles associated with developing its own competing solution.  By hijacking SkyBell's technology, ADC secured an artificial (and unlawful) shortcut to market and divert SkyBell's customer base for its own profit.

10

This was not inadvertent or negligent. It was willful, malicious theft, executed with the purpose and effect of inflicting commercial harm on SkyBell while enriching ADC through unlawful means.

**D.    ADC Has Willfully Infringed SkyBell's Copyrighted Source Code**

33.    SkyBell's investment in its proprietary video doorbells goes beyond its trade secrets. SkyBell also authored and owns the copyright in original source code files that operate the SkyBell backend and the SkyBell video doorbells (collectively, the "SkyBell Copyrighted Work"). ███████████████████████████████████████████████████ The SkyBell Copyrighted Work spans thousands of lines of original source code across many interrelated files.

34.    The SkyBell Copyrighted Work, including the SkyBell Event Broadcast Code, is original, creative, and copyrightable subject matter under the copyright laws of the United States. The SkyBell Copyrighted Work includes creative expression, including, for example, proprietary source code, command expressions, organization and command hierarchies, comments, and definitions.

35.    SkyBell solely owns all right, title, and interest in the copyright in the SkyBell Copyrighted Work, including the SkyBell Event Broadcast Code, which was duly registered with the United States Copyright Office as Registration No. TXu 2-539-782.

11

36.    SkyBell developed the SkyBell Copyrighted Work—including the underlying source code—through its own engineers and, in part, through engineering and software development firms that it engaged on a work-for-hire basis.  Each of those engagements was governed by a written agreement that vested ownership of all resulting source code, inventions, and other works of authorship, and the copyrights in them, exclusively in SkyBell.

37.    ADC is a signatory to one such agreement executed in October 2018, which provides, among other things, that all █████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ and further provides that such works ████ ████████████████████████████████████████ ███████    ADC was well aware of and is bound by SkyBell's exclusive ownership of the SkyBell Copyrighted Work, including the source code that ADC has copied and used to create derivative works as alleged herein.

38.    SkyBell's engineers made numerous original creative choices in developing the SkyBell Copyrighted Work, including the SkyBell Event Broadcast Code.  For example, when developing the source code for event broadcast notifications, SkyBell's engineers chose from a wide range of options to define the structure and taxonomy of the data and event messages exchanged between devices; the format and contents of the packets that the devices transmit when an event occurs; the names, structures, and purposes of libraries, commands, and prompts and the algorithms and logic that encode, transmit, receive, and process those packets and facilitate the functionality of the event broadcast notifications.  There were virtually unlimited alternative ways to structure the event taxonomy, name the data fields, organize the payload format, implement

12

authentication, and arrange the source code files.  SkyBell's specific selections among these alternatives constitute original creative expression and are not dictated by any external factors, hardware constraint, protocol specification, or industry standard.

39.    As a result of numerous individual creative choices by SkyBell's engineers, the resulting structure, sequence, and organization of the SkyBell Copyrighted Work, including SkyBell Event Broadcast Code—together with its source code, command expressions, and naming conventions—constitutes a unique and original expression that reflects SkyBell's engineering discretion and substantial creative effort over many years.

40.    On numerous source code files in the SkyBell Copyrighted Work, SkyBell included the word "copyright," the copyright symbol ©, and its name "SkyBell, Inc., expressly identifying SkyBell as the owner of the copyright in that creative expression and placing any party with access to the source code on notice of SkyBell's copyright ownership.

41.    As discussed above, ADC had access to the SkyBell Copyrighted Work through the DIA.  The DIA, however, only gave ADC a term-limited license to access SkyBell's API and other technology to integrate SkyBell's video doorbells into ADC's home security platform, and expressly prohibited each party from modifying or creating a derivative work of the other party's software (except as otherwise expressly authorized by the other party in writing).  The DIA was also explicit that the term-limited license did not give ADC any right or interest in SkyBell's API or software, unless specifically set forth in the DIA, and that SkyBell retained all rights, title and interest in and to its own software, including all modifications, derivative works or improvements, and all related intellectual property rights.

42.    The narrow license in the DIA was later supplemented by the Fifth Amendment to the DIA, dated June 24, 2020, but that supplement did not authorize the infringement alleged here.

Under Section 5(b) of the Fifth Amendment, SkyBell granted ADC "a perpetual, worldwide, fully paid-up right and license to use, modify, and create derivative works (only for use with the Hosted Devices) of such source code that operates the Hosted Devices in the SkyBell AWS instance, Alarm.com's AWS instance and Alarm.com's NOC."  The "Hosted Devices" are expressly and exhaustively defined in Section 5(a) as four legacy SkyBell-branded products—the SkyBell HD (VDB101/VDB102), Slimline (VDB105/VDB106), Trim Plus (VDB107), and Slim II (VDB105X/VDB106X).  The Fifth Amendment further makes clear, "[f]or clarity," that the derivative-works license "will provide the right to create derivative works only to modify and maintain such source code in order to exclusively support the Alarm.com Hosted Devices once the devices are transitioned to the Alarm.com AWS instance or Alarm.com NOC."  Section 5(c)'s separate, narrower license for the firmware of certain "Retired Devices" is similarly limited "for use only as the firmware on the Retired Devices" and "shall not extend to cover or support any other devices by any party or SkyBell video doorbells that are not part of the Retired Devices." SkyBell's copyright infringement allegations herein do not arise from ADC's licensed use of the SkyBell Copyrighted Work to operate or maintain the Hosted Devices or Retired Devices.  Rather, they arise from ADC's reproduction and distribution of, and creation of derivative works based on, the SkyBell Copyrighted Work in connection with ADC's own competing video doorbell products—including, without limitation, the ADC-VDB770, ADC-VDB780B, ADC-VDB750, ADC-VDB755P, ADC-VDB775, and ADC-VDB781B—and the supporting backend infrastructure that ADC built around those products.  Use of the SkyBell Copyrighted Work for those products falls entirely outside the limited Hosted Devices and Retired Devices licenses and is unauthorized and infringing.

14

43.     Several of the files that ADC had access to and copied and/or created derivative works of had the word "copyright," the copyright symbol ©, and the name "SkyBell, Inc." clearly marked at the beginning of the file.

44.     ADC intentionally and willfully copied and created derivative works of the SkyBell Copyrighted Work into the firmware of its competing video doorbell products and source code for its supporting backend services.

45.     Copies and/or derivative works of the SkyBell Copyrighted Work reside in the firmware of every video doorbell ADC manufactures, distributes, and sells.  ADC reproduces and distributes the SkyBell Copyrighted Work and/or derivative works thereof each time it manufactures, ships, and sells a video doorbell.  ADC reproduces and distributes them again each time it pushes a firmware update to a deployed device.  And ADC reproduces the SkyBell Copyrighted Work and/or derivative works thereof each time it copies, ports, adapts, or uses that source code to develop a new model or version of its video doorbell products, including any successor or follow-on doorbell ADC has released or is now developing.  On information and belief, ADC has also reproduced, incorporated and/or created derivative works of the SkyBell Copyrighted Work in connection with its other video products beyond ADC's video doorbell lines, including ADC's video cameras products and security systems products.

46.     Copies and/or derivative works of the SkyBell Copyrighted Work also reside in ADC's supporting backend services for its video doorbell products.  ADC reproduces and distributes the SkyBell Copyrighted Work and/or derivative works thereof each time its supporting backend services are used in connection with or by a video doorbell in operation.  And ADC reproduces the Copyrighted Work and/or derivative works thereof each time it copies, ports, adapts, or uses that source code to develop a new version of its supporting backend services for its

15

video doorbell products, including any successor or follow-on backend services ADC has released or is now developing.

47.    As SkyBell has uncovered during discovery in this litigation, ADC's copying and/or creation of derivative works was deliberate and documented.  ADC explicitly instructed its engineers to implement ████████████████████████████████████ ████████████████████████████████████████████████████ That instruction told ADC engineers to copy SkyBell's expression ███████████████████████ ███████—rather than develop their own.

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

ALARM_00188019 at -188019 (annotated).

48.    Not only did ADC instruct its engineers to copy and/or create a derivative copy of the SkyBell Copyrighted Work, ADC in fact did so and continued to copy and/or create derivative works of the SkyBell Copyrighted Work for years in each and every successor video doorbell product.  ADC's internal documents produced in discovery confirm that ADC in fact

████████████████████████████████████████████████████
██████████████████████



ALARM_00208657 at -208657 (annotated).

49.     In July 2025, ADC directed an ADC engineer to integrate ████████████ into its platform for the ████████████████████████████ ████████ from ADC's source code. ADC directed this copying ████████████ ████████████████████████████—demonstrating that ADC's infringement is ongoing, deliberate and willful even in the face of active litigation.

ALARM_00215789 at -215789 (annotated).

50.     In that same document, the assigned engineer reported that the ████████████ ████████████████████████ and noted that an example produced ████████████ ████████████████████████ from ADC's existing source code, which itself ████████████████████—confirming that ADC engineers copied SkyBell's code, ████████ ████████

17



ALARM_00215789 at -215791 (annotated).

51.     ADC's deployed firmware likewise contains unmistakable copied SkyBell source code. Logs generated in connection with ADC's ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████ *See* ALARM_00203634, at -203634; ALARM_00204750 at -204750. ADC's source code reproduces SkyBell's proprietary ████████████████████████████████████████████████ ████████████████████████████████████████████████

*See* ALARM_00215789 at -215790 (annotated).

52.     Indeed, ADC's source code shows that ADC copied portions of SkyBell's source code ███████. And even where ADC did not copy the ████████████████████, ADC's source code (i) ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████. The uniquely expressed structure, sequence, organization, architecture, modules, naming conventions, and source code of the SkyBell Copyrighted Work appear ███████████████████████████████████████.

### E.    Tolling of the Statute of Limitations

53.    ADC actively and fraudulently concealed its infringement and misappropriation from SkyBell. The DIA expressly required ADC to maintain the confidentiality of SkyBell's trade secrets and not use them for any purpose other than the limited use provided therein. The DIA also expressly prohibited each party from modifying or creating a derivative work of the other party's software (except as otherwise expressly authorized by the other party in writing). SkyBell reasonably relied on ADC to comply with its contractual obligations.

54.    When SkyBell became concerned that ADC had developed its competing video doorbell product using SkyBell's technology, SkyBell officers Mr. Giovanni Tomaselli and Ms. Desiree Mejia raised their concerns directly with ADC executive Dan Ramos. Mr. Ramos (acting on behalf of and for the benefit of ADC) affirmatively and fraudulently represented to SkyBell that ADC had used its own source code and technology, not SkyBell's. SkyBell reasonably relied on ADC's representation. But that representation was false and prevented SkyBell from discovering ADC's misconduct.

55.    SkyBell did not have access to ADC's source code at any time before this litigation. ADC has never made its source code available to SkyBell, the public, or any third party from whom SkyBell could have obtained it. SkyBell could not have discovered the infringement through external examination of the ADC's products, and the DIA expressly barred SkyBell from

19

decompiling, disassembling, or otherwise reverse engineering ADC's software or attempting to discover any source code or underlying ideas or algorithms of ADC's software. This contractual prohibition meant that SkyBell could not inspect, decompile, or otherwise examine ADC's source code to determine whether ADC had misappropriated SkyBell's trade secrets and copied the SkyBell Copyrighted Work and/or created derivative works based on the SkyBell Copyrighted Work. SkyBell did not learn, and could not through reasonable diligence have learned, that ADC had misappropriated SkyBell's trade secrets, and copied the SkyBell Copyrighted Work and/or created derivative works of them until ADC produced its source code and related internal records in discovery in this litigation.

## COUNT I
## (MISAPPROPRIATION UNDER THE DEFEND TRADE SECRETS ACT)

56. SkyBell realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Amended Complaint.

57. SkyBell has spent years developing proprietary technologies relating to video doorbells, and these proprietary technologies constitute trade secrets as defined by the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.

58. SkyBell is the sole and exclusive owner of the trade secrets misappropriated by ADC described above.

59. SkyBell's trade secrets are related to products and services used in, or intended for use in, interstate and foreign commerce.

60. SkyBell used, and continues to use, its trade secrets throughout the United States, including in connection with its continued development and promotion of its video doorbell and other home security products, which it sells throughout the United States.

20

61.     SkyBell's trade secrets derive independent economic value, both actual and potential, from not being generally known and not being readily ascertainable through proper means by SkyBell's competitors, including ADC, or to other persons or entities who might obtain economic value from their disclosure or use.

62.     SkyBell takes reasonable measures under the circumstances to protect the secrecy of such trade secrets, including as described above.

63.     During its partnership with SkyBell, ADC acquired limited rights to use SkyBell's trade secrets under circumstances giving rise to a duty to maintain the secrecy of SkyBell's trade secrets.  To this day, ADC is still in possession of SkyBell's trade secrets, as described above.

64.     Following SkyBell's termination of the parties' supply agreement, ADC improperly used and/or disclosed to others SkyBell's trade secrets, for its own benefit and without SkyBell's express or implied consent, in violation of its obligations to SkyBell.

65.     ADC misappropriated SkyBell's trade secrets, has used, and continues to use SkyBell's trade secrets without authorization and in violation of ADC's obligations not to use such information for its own benefit.  ADC's misappropriation, as set forth above, constitutes misappropriation as defined by 18 U.S.C. § 1839(5).

66.     ADC's misappropriation of SkyBell's trade secrets was and continues to be intentional, knowing, willful, and malicious.  ADC knew or should have known that SkyBell's trade secrets should not be misappropriated by a competitor, including because ADC knew or should have known of its obligations to maintain the secrecy of SkyBell's trade secrets, as described above.  ADC further knew or should have known that SkyBell maintains its trade secrets as confidential and its trade secrets are not generally available to the public or SkyBell's competitors, such that having its trade secrets would provide significant benefit to a competitor

seeking to compete with SkyBell.  Thus, SkyBell is entitled to an award of exemplary damages and reasonable and necessary attorneys' fees.

67.    As a direct and proximate result of ADC's willful, improper, and unlawful misappropriation of SkyBell's trade secrets, SkyBell has suffered, and will continue to suffer, damages while ADC has been unjustly enriched, in an amount to be proven at trial.

68.    SkyBell is also entitled to injunctive relief to protect its trade secrets by (1) enjoining ADC from further possessing, using, or disclosing SkyBell's trade secrets; (2) enjoining ADC from altering or deleting SkyBell's trade secrets, or any related evidence; and (3) requiring ADC to turn over any and all copies of SkyBell's trade secrets to SkyBell.  SkyBell has no adequate remedy at law.

**COUNT II**
**(MISAPPROPRIATION UNDER THE**
**VIRGINIA UNIFORM TRADE SECRETS ACT)**

69.    SkyBell realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Amended Complaint.

70.    SkyBell has spent years developing proprietary technologies relating to video doorbells, and these proprietary technologies constitute trade secrets as defined by the Virginia Uniform Trade Secrets Act, Va. Code § 59.1-336 *et seq*.

71.    SkyBell is the sole and exclusive owner of the trade secrets misappropriated by ADC described above.

72.    SkyBell's trade secrets are related to products and services used in, or intended for use in, interstate and foreign commerce.

73.    SkyBell used, and continues to use, its trade secrets throughout the United States and in the Commonwealth of Virginia, including in connection with its continued development and promotion of its video doorbell and other home security products.

74.     SkyBell's trade secrets derive independent economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means by SkyBell's competitors, including ADC, or to other persons or entities who might obtain economic value from their disclosure or use.

75.     SkyBell takes reasonable measures under the circumstances to protect the secrecy of such trade secrets, including as described above.

76.     During its partnership with SkyBell, ADC acquired limited rights to use SkyBell's trade secrets under circumstances giving rise to a duty to maintain the secrecy of SkyBell's trade secrets.  To this day, ADC is still in possession of SkyBell's trade secrets, as described above.

77.     Following SkyBell's termination of the parties' supply agreement, ADC improperly used and/or disclosed to others SkyBell's trade secrets, for its own benefit and without SkyBell's express or implied consent, in violation of its obligations to SkyBell.

78.     ADC misappropriated SkyBell's trade secrets, has used, and continues to use SkyBell's trade secrets without authorization and in violation of ADC's obligations not to use such information for its own benefit.  ADC's misappropriation, as set forth above, constitutes misappropriation as defined by the Virginia Uniform Trade Secrets Act, Va. Code § 59.1-336 *et seq*.

79.     ADC's misappropriation of SkyBell's trade secrets was and continues to be intentional, knowing, willful, and malicious.  ADC knew or should have known that SkyBell's trade secrets should not be misappropriated by a competitor, including because ADC knew or should have known of its obligations to maintain the secrecy of SkyBell's trade secrets, as described above.  ADC further knew or should have known that SkyBell maintains its trade secrets as confidential and its trade secrets are not generally available to the public or SkyBell's

23

competitors, such that having its trade secrets would provide significant benefit to a competitor seeking to compete with SkyBell.  Thus, SkyBell is entitled to an award of punitive damages and reasonable and necessary attorneys' fees.

80.     As a direct and proximate result of ADC's willful, improper, and unlawful misappropriation of SkyBell's trade secrets, SkyBell has suffered, and will continue to suffer, damages while ADC has been unjustly enriched, in an amount to be proven at trial.

81.     SkyBell is also entitled to injunctive relief to protect its trade secrets by (1) enjoining ADC from further possessing, using, or disclosing SkyBell's trade secrets; (2) enjoining ADC from altering or deleting SkyBell's trade secrets, or any related evidence; and (3) requiring ADC to turn over any and all copies of SkyBell's trade secrets to SkyBell.  SkyBell has no adequate remedy at law.

## COUNT III
## (COPYRIGHT INFRINGEMENT UNDER THE COPYRIGHT ACT)

82.     SkyBell realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Amended Complaint.

83.     The SkyBell Copyrighted Work are original, creative works and are copyrightable subject matter under the copyright laws of the United States.

84.     SkyBell is the sole owner of valid copyrights in the SkyBell Copyrighted Work.

85.     SkyBell has complied in all respects with 17 U.S.C. §§ 101 et seq. and has secured the exclusive rights and privileges in and to the copyright in the SkyBell Copyrighted Work.

86.     As alleged above, ADC had access to the SkyBell Copyrighted Work, and ADC has infringed and continues to infringe SkyBell's copyrights in the SkyBell Copyrighted Work in violation                     of                     Section                     106 and 501 of the Copyright Act, 17 U.S.C. §§ 106 and 501.  ADC reproduces, distributes, and/or

24

creates derivative works of the SkyBell Copyrighted Work without authorization. ADC's infringement includes both literal copying of SkyBell's source code and non-literal copying of its structure, sequence, and organization.

87. The SkyBell Copyrighted Work and/or derivative works thereof are embedded in the firmware of each ADC video doorbell and are reproduced and distributed with each device sold and each firmware update deployed. ADC further reproduces, distributes and/or creates derivative works of the SkyBell Copyrighted Work each time it copies, ports, adapts, or uses that source code to develop a new model or version of its video doorbell products. Each such act constitutes a separate and distinct act of infringement. On information and belief, ADC has also reproduced, incorporated and/or created derivative works of the SkyBell Copyrighted Work in connection with its other video products beyond ADC's video doorbell lines, including ADC's video cameras products and security systems products.

88. The SkyBell Copyrighted Work and/or derivative works thereof are also embedded in ADC's supporting backend services for its video doorbell products and are reproduced each time its supporting backend services are used in connection with or by a video doorbell in operation. ADC further reproduces, distributes, and/or creates derivative works of the SkyBell Copyrighted Work each time it copies, ports, adapts, or uses that source code to develop a new version of its supporting backend services for its video doorbell products. Each such act constitutes a separate and distinct act of infringement.

89. Any license ADC previously held to the SkyBell Copyrighted Work was limited in scope, duration, and purpose as described above. ADC's reproduction, distribution, and/or creation of derivative works of the SkyBell Copyrighted Work in connection with its own competing video doorbell products—including, without limitation, the ADC-VDB770, ADC-

25

VDB780B, ADC-VDB750, ADC-VDB755P, ADC-VDB775, and ADC-VDB781B—falls outside the scope of any license and is entirely unauthorized.

90.    ADC's infringement of SkyBell's copyright has been deliberate, willful, and in utter disregard of SkyBell's rights.

91.    Upon information and belief, and as a direct and proximate result of its wrongful conduct, ADC has obtained benefits to which ADC is not entitled.

92.    As a direct and proximate cause of ADC's wrongful conduct, SkyBell has been substantially and irreparably harmed in an amount not readily capable of determination.  Unless restrained by this Court, ADC will cause further irreparable injury to SkyBell.

93.    SkyBell is entitled to injunctive relief enjoining ADC, its agents and employees, and all persons acting in concert or participation with it, from engaging in any further infringement of the SkyBell Copyrighted Work.

94.    SkyBell is further entitled to recover from ADC the damages and costs it has sustained and will sustain, and any gains, profits, and advantages obtained by ADC as a result of its acts of infringement as alleged above.  At present, the amount of such damages, gains, profits, and advantages cannot be fully ascertained by SkyBell, but will be established according to proof at trial.

## REQUEST FOR JURY TRIAL

SkyBell hereby demands a trial by jury on all claims so triable presented in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, SkyBell respectfully prays for relief as follows:

1.    Judgment in SkyBell's favor and against ADC on all causes of action;

2.    Judgment that ADC misappropriated SkyBell's trade secrets;

26

3.  Judgment that ADC's misappropriation of SkyBell's trade secrets was willful and malicious;

4.  Judgment that ADC has infringed SkyBell's copyrights in the SkyBell Copyrighted Work;

5.  Judgment that ADC's infringement of SkyBell's copyrights was willful;

6.  Injunctive relief to prevent use by ADC of any of the trade secrets belonging to SkyBell or any information, strategies, source code, or anything else derived from SkyBell's trade secrets;

7.  Injunctive relief enjoining ADC from further infringing SkyBell's copyrights, including by reproducing, distributing, publicly displaying, or creating derivative works based on the SkyBell Copyrighted Work;

8.  Impoundment and disposition of all infringing articles, copies, and the means by which such copies may be reproduced, pursuant to 17 U.S.C. § 503;

9.  Compensation in an amount to be proven at trial, including but not limited to unjust enrichment, actual losses, lost profits, and/or imposition of a reasonable royalty;

10.  Actual damages and ADC's profits pursuant to 17 U.S.C. § 504(b), and, to the extent available, statutory damages pursuant to 17 U.S.C. § 504(c);

11.  Pre-judgment interest;

12.  Post-judgment interest;

13.  Exemplary damages, pursuant to 18 U.S.C. § 1836(b)(3)(C), and to the extent provided by law;

14.  Attorneys' fees, including pursuant to 18 U.S.C. § 1836(b)(3)(C) and/or Virginia Uniform Trade Secrets Act, Va. Code § 59.1-338.1;

15. Costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505, to the extent available;

16. Punitive damages, including pursuant to Virginia Uniform Trade Secrets Act, Va. Code § 59.1-338(B);

17. An order requiring ADC to account for all gains, profits, and advantages derived from its infringement of SkyBell's copyrights or misappropriation of SkyBell's confidential, proprietary, or trade secret information, and an order imposing a constructive trust over profits derived from ADC's infringement or misappropriation;

18. An order that ADC immediately assign, transfer, and return all right, title, and interest in SkyBell's trade secrets that ADC misappropriated and all other of SkyBell's confidential information that was improperly used by ADC, in all forms and in all manners in which they now exist, whether in electronic form, paper format, or in any other tangible or intangible entitlement or format, so that SkyBell retains all legal and equitable title in its trade secrets and confidential information; and

19. Any further relief that this Court deems just and proper.

Dated: May 26, 2026                              Respectfully submitted,

By: */s/ Roman Lifson*

Roman Lifson (VSB No.43714)
Belinda D. Jones (VSB No. 72169)
Christian & Barton, LLP
901 E. Cary Street
Suite 1800
Richmond, VA 23219
Telephone: (804) 697-4100
Fax: (804) 697-4112

Giri Pathmanaban
gpathmanaban@cgsh.com
Lucas Lonergan
llonergan@cgsh.com
Cleary Gottlieb Steen & Hamilton
1841 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 815-4100
Fax: (650) 815-4199

Thomas Yeh
tyeh@cgsh.com
Cleary Gottlieb Steen & Hamilton
650 California St., Suite 2400
San Francisco, California 94108
Telephone: (415) 796-4400
Fax: (415) 796-4499

Clement Naples
cnaples@cgsh.com
Cleary Gottlieb Steen & Hamilton
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Fax: (212) 225-3999

*Counsel for Plaintiff SkyBell Technologies, Inc.*

29